IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-60575
_____


CATHLEEN J. MARTIN,

                                        Plaintiff-Appellant,

                    versus

MICHAEL MILLER,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____

(  September 18, 1995  )

Before GARWOOD, JOLLY, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:


Since the earliest days of our republic, federal law has afforded a remedy to seamen when payment of their wages is delayed without sufficient cause. Since 1915, the law has required the master or owner of the vessel to pay a seaman twice his daily wage for each day that payment is unjustifiably delayed. In this case, seaman Cathleen Martin seeks to collect these double wage damages in the amount of $155,828.88 from the master of the vessel, Michael Miller, in his individual capacity. This case is complicated by the fact that the vessel, although operated by a private concern, is owned by the Maritime Administration ("MarAd"), an agency of the

United States.  The district court dismissed this libel in personam based on its determination that the Clarification Act, 50 U.S.C. App. § 1291, a World War II-era shipping law that spells out the rights of seamen employed on government vessels, allows Martin to enforce her claim only under the Suits in Admiralty Act.  The Suits in Admiralty Act, however, generally protects the master from individual liability.  This appeal requires us to consider the complex question whether the Suits in Admiralty Act bars this particular libel as a matter of law.  We find the answer to be yes, and affirm the judgment of the district court.

I

A

We should establish at the outset what this particular libel is and what it is not.  This libel seeks the recovery of double wages personally from an individual who was the master of a United States vessel.  This libel is not brought against the United States:  the United States has never been a defendant in this libel, and has not sought to be joined or to intervene.  Instead, the master, Michael Miller, is the only defendant.

The United States appears in this suit, however, on Miller's behalf, and asserts two reasons for dismissing this libel.  First, it contends, because Martin has not exhausted the administrative remedies required by the Clarification Act, there is no federal subject matter jurisdiction over this case.  Second, it argues, this case must be dismissed because, pursuant to the terms of the

Clarification Act, Martin's sole remedy is a suit against the United States under the Suits in Admiralty Act. Because the arguments of the parties thrust the relatively obscure Clarification Act into the spotlight, we should briefly digress for a word or two on the Act, and its relation to the Suits in Admiralty Act, before describing the facts and procedural history of this case.

B

(1)

Enacted on March 24, 1943, the Clarification Act was a product of the national wartime mobilization of our maritime resources. The mobilization has been described on another occasion:

> [D]uring most of the Second World War substantially our entire merchant marine became part of a single vast shipping pool, said to have been the largest in history, operated and controlled by the United States through the War Shipping Administration. So huge an enterprise necessarily comprehended many intricate and complex readjustments from normal, peacetime shippping arrangements.
> * * *
> Eventually almost every vessel not immediately belonging to naval and other armed forces came under the Administration's authority. Otherwise than by direct construction and ownership, this was accomplished by transfer from private shipping interests to the administration, pursuant to requisition or other arrangement.

Hust v. McCormack Lines, 328 U.S. 707, 710 (1946), overruled by Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783 (1949) (footnotes omitted). Cosmopolitan Shipping Co. identified the factors that prompted what was in effect the nationalization of our

nation's maritime fleet:  "Secrecy, speed, and efficiency of operation were of paramount importance.  Direct governmental operation of the merchant fleet insured sovereign immunity from regulation, taxation, and inspection, by other sovereignties both local and foreign."  337 U.S. at 796-97.

Of course, seamen would be needed to man the vessels, and "the industry's transfer from private to public control was achieved to a very great extent by making use not only of private property but also of private shipping men, both in management and for labor." Hust, 328 U.S. at 710-11 (footnote omitted).  Their status too was an issue of paramount concern:

> At the time of the wartime requisition of the privately owned merchant fleet the government administrative agencies gave careful study to the question of whether the crews were to be employees of the shipping companies or the United States.  There were outstanding many collective bargaining agreements between the private shipping companies and the maritime unions.  It was manifestly undesirable to disturb these existing agreements and for the government to negotiate new ones. Yet it was essential that the masters and crews be government employees in order to obviate strikes and work stoppages, to insure sovereign immunity for the vessels, and to preserve wartime secrecy by confining all litigation concerning the operation of the vessels to the admiralty courts where appropriate security precautions could be observed.

Cosmopolitan Shipping Co., 337 U.S. at 798-99.  To achieve these ends, it was decided that, although general agents would procure seamen, they would be hired by the master and subject to his orders only; the practical consequence was that such seamen would become employees of the United States, not of the general agent. Id.  But

-4-

despite the study and consideration given to the question of the status of seamen in the employ of the War Shipping Administration, confusion and uncertainty ensued concerning their rights and remedies. The Clarification Act was designed to remove the confusion and uncertainty. See id. at 726 n.32 (quoting the legislative history of the Act). In relevant part, the Clarification Act declares that

> Officers or members of crews employed on United States or foreign flag vessels as employees of the United States through the War Shipping Administration shall, with respect to (1) laws administered by the Public Health Service and the Social Security Act . . . (2) deaths, injuries, illness, maintenance and cure, loss of effects, detention, or repatriation, or claims arising therefrom not covered by the foregoing clause (1); and (3) collection of wages and bonuses and making of allotments have all of the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated vessels.

50 U.S.C. App. 1291(a). (We consider today whether Martin's claim falls within the class of claims specified in clause (3).)

The Clarification Act also specifies the means by which the rights of the seamen are to be enforced. In relevant part, the Act provides that

> Claims arising under clause (1) hereof shall be enforced in the same manner as such claims would be enforced if the seaman were employed on a privately owned and operated American vessel. Any claim referred to in clause (2) or (3) shall, if administratively disallowed in whole or in part, be enforced pursuant to the provisions of the Suits in Admiralty Act [46 U.S.C. App. § 741 et seq], notwithstanding the vessel on which the

> seaman is employed is not a merchant vessel within the meaning of such Act.[1]

Id. The parties dispute whether Martin's double wage claim is a wage claim within class (3); if it is, the Clarification Act requires it to be enforced pursuant to the Suits in Admiralty Act. A word is therefore in order concerning the Suits in Admiralty Act.

### (2)

We have explained that the Suits in Admiralty Act does not itself provide any substantive rights:  instead, it "merely provides a jurisdictional hook upon which to hang a traditional admiralty claim" against the United States.  Trautman v. Buck Steber, Inc., 693 F.2d 440, 444 (5th Cir. 1982), quoted in Williams v. Central Gulf Lines, 874 F.2d 1058, 1059 (5th Cir. 1989).  In other words, the Suits in Admiralty Act waives the sovereign immunity of the United States.  It declares in relevant part that "[i]n cases where if such vessel were privately owned or operated . . . or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United

---

[1]This "notwithstanding" clause was necessary because, when the Clarification Act was enacted, The Suits in Admiralty Act contained a proviso limiting its waiver of sovereign immunity only to cases involving vessels employed as merchant vessels and tugboats.  This proviso was deleted in 1960.  The Senate Report accompanying Pub. L. 86-770, the 1960 amendment, explained that this limitation had "produced uncertainty and obscurity" and inconsistent results "on essentially identical facts because of different interpretations of the same words . . . 'employed' and 'merchant vessel.'"  See Sen. Rep. No. 1894, 86th Cong., 2d Sess., reprinted in 1960 U.S.C.C.A.N. 3583, 3586.

States." 46 U.S.C. § 742. In addition, the Act immunizes agents and employees of the United States from individual liability by excluding "any other action by reason of the same subject matter" of a libel in personam that is brought under the Suits in Admiralty Act, but only "where a remedy is provided by" the Act. 46 U.S.C. § 745. Thus, in this case, if Martin's claim is within the Clarification Act, and a remedy is provided by the Suits in Admiralty Act, then this libel against Miller is excluded by law and must be dismissed.

Finally, we should also point out that, although the legislative history of the Clarification Act is a messy affair, as is often the case with legislative histories, the Supreme Court has explained that it

> give[s] evidence of concern that rights may have been lost or rendered uncertain by the transfer [of the vessels to government control], and that action should be taken by Congress to preserve the substantive rights intact and the remedial ones at the least by the extension of the Suits in Admiralty Act to cover them.
> The entire history will be read in vain, however, for any clear expression of intent to take away rights, substantive or remedial, of which the seaman had not already been deprived, actually or possibly, by virtue of the transfer [of the vessel from private to government control].

Hust at 733. With this understanding of the statutory setting, we turn to the facts and proceedings in this case.

-7-

## II

## A

MarAd is the successor of the War Shipping Administration, referred to above in the Clarification Act. MarAd and the United States Department of Transportation, and therefore the United States, own the M/V CAPE FLORIDA. The vessel is operated by International Marine Carriers, Inc., a private concern. Cathleen Martin, a resident of Mississippi, worked aboard the M/V CAPE FLORIDA at a daily wage of $113.91. The master of the vessel, Michael Miller, is a resident of Texas.

During Martin's tour of duty, the M/V CAPE FLORIDA had been tendered to the United States Military Sealift Command for service during the Desert Shield and Desert Storm military operations. Miller states in an affidavit that his "first and only obligation . . . was to the United States as vessel owner," that all of his voyage orders came from the United States through MarAd, the Department of Defense, or the Military Sealift Command, and that he was subject to federal criminal penalties if he failed to obey any lawful order issued by the United States.

Martin completed her tour of duty and signed off the vessel on December 1, 1990. When Martin signed off, Miller paid her $740 of the $1540 she was owed as wages. Payment of the remaining $800 was delayed for 684 days, until October 16, 1992, without explanation.

B

As stated earlier, federal law has long permitted seamen to make a claim for damages when the payment of their wages has been delayed without cause.[2] In an effort to recover damages assertedly due to her on this claim, Martin filed two libels in personam in the federal district courts of this Circuit. The first libel, filed in the Southern District of Mississippi (the "Mississippi libel"), named as defendants the United States, the Department of Transportation, MarAd, and Michael Miller, individually, as the master of the vessel. The second libel, filed in the Southern District of Texas (the "Texas libel"), named only Miller as a defendant. This appeal is from the Texas district court's dismissal of her libel.

---

[2]See Act of June 7, 1872, ch. 322, § 35, 17 Stat. 269 (a "master or owner who neglects or refuses to make payment . . . without sufficient cause shall pay to the seaman a sum not exceeding the amount of two days' pay for each of the days, not exceeding ten days, during which the payment is delayed . . . which sum shall be recoverable as wages in any claim made before the court"); Act of Dec. 21, 1898, ch. 28, § 4, 30 Stat. 756 (removing the ten-day limitation and dropping the increment to one day's wages, thus, effectively requiring the master or owner to pay the seaman his regular wage for each day of unjustified delay); Seamen's Act of 1915, ch. 153, § 3, 38 Stat. 1164 (increasing the increment to double wages). In the 1983 partial revision of Title 46, this obligation was amended to declare that "the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed" and has been recodified at 46 U.S.C. § 10313(g) (applicable to vessels of the United States on voyages between the United States and foreign ports other than ports in Mexico, Canada, or the West Indies, or between ports on the Atlantic coast and the Pacific coast of the United States) and 46 U.S.C. § 10504(c) (applicable to vessels of the United States on voyages between ports of the United States that are not covered by § 10313(g)).

While this libel was pending, the Mississippi district court dismissed the Mississippi libel with respect to all of the defendants except Miller. The dismissal of the claims against the Department and MarAd was by agreement and with prejudice. The claim against the United States was dismissed based upon deficiencies in the service of process; this dismissal was without prejudice. Finally, the court did not dismiss the claim against Miller, but ordered Martin to show within ten days that the service of process was sufficient as against Miller.

The record before us does not indicate what additional action, if any, was taken on the Mississippi libel. Martin's counsel stated at oral argument that he did not appeal the dismissal, but instead treated this pending Texas libel as a "refiling" of the Mississippi libel.

This Texas libel before us today, which named only Miller as a defendant, was dismissed with prejudice on August 1, 1994. The district court determined that the Suits in Admiralty "provided a remedy," within the meaning of 46 U.S.C. § 745, and thus a libel against the United States was exclusive of any other action. As a consequence, the district court dismissed Martin's libel against Miller. The district court expressed no opinion on whether double wages are recoverable against the United States. From the order dismissing the Texas libel, this appeal followed.

As a member of the crew of a United States vessel employed through MarAd as an employee of the United States, Martin is plainly a seaman within the Clarification Act.[3]  As explained above, the United States argues that this libel must be dismissed because (A) Martin did not exhaust the administrative remedies

_____

[3]Martin raises two arguments in dispute of this fact.  First, she argues, she is not covered by the Clarification Act because her service was not of a temporary wartime character of employment. This argument must be based on the sentence of the Clarification Act that declares that seamen such as she, who work for MarAd, "because of the temporary wartime character of their employment by the War Shipping Administration, shall not be considered as officers or employees of the United States for the purposes of" certain federal statutes that are not relevant here.  50 U.S.C. App. § 1291(a) (emphasis added).  This sentence of the Act simply states that the seamen that are covered by the Clarification Act are not considered officers or employees of the United States for the purposes of certain other federal statutes because their government service is temporary; it does not limit the application of the Clarification Act.  See also Doyle v. Bethlehem Steel Corp., 504 F.2d 911, 912-13 (5th Cir. 1974) (rejecting a similar argument).

Second, Martin argues that she is not covered by the Clarification Act because she was employed by International Marine Carriers, Inc., the private operator, not MarAd or the United States.  The form of the employer-employee relationship is not dispositive, however, of the question whether she is a seaman within the terms of the Clarification Act.  See id. at 913-14; River & Offshore Servs. Co., Inc. v. United States, 651 F.Supp. 276, 278 (E.D.La. 1987) (recognizing that a "long line of cases establishes that a contract operator of a naval vessel . . . is an agent of the United States for purposes of [the Suits in Admiralty Act]").  Moreover, Martin's libel alleged that the vessel was operated by MarAd and the "U.S. Navy, Military Sealift Command and/or International Marine Carriers, Inc."  An affidavit by the procuring contract officer stated that the contract between International Marine Carriers and MarAd provided that it was to man, equip, and maintain the vessel subject to the master's complete authority.  In short, International Marine Carriers and Miller are agents of the United States and Martin is a seaman within the terms of the Clarification Act.

provided by the Clarification Act, and (B) the exclusivity provision of the Suits in Admiralty Act, 46 U.S.C. § 745, bars this libel against Miller.  We consider these matters in order.

A

The United States argues first that this libel must be dismissed for lack of subject matter jurisdiction because Martin did not exhaust her administrative remedies.  The position of the United States is that federal subject matter jurisdiction over this libel against Miller exists, if at all, by virtue of the Clarification Act and the waiver of sovereign immunity contained in the Suits in Admiralty Act, 50 U.S.C. App. § 1291 and 46 U.S.C. § 742, respectively.  Because the Clarification Act contains an administrative exhaustion requirement, and because the administrative exhaustion requirement is jurisdictional, the United States argues, Martin must present her claim to MarAd as a prerequisite to maintaining this libel.  Because she has not presented her claim to MarAd, the United States argues, we lack subject matter jurisdiction over this case.

We do not agree.  Although we have recognized that claims against the United States must be dismissed if administrative remedies have not been exhausted, Fox v. Alcoa S.S. Co., 143 F.2d 667 (5th Cir. 1944), cert. denied, 323 U.S. 788 (1944), it is clear that the administrative exhaustion requirement is applicable only to suits against the United States.  As we have explained, Martin makes no claim against the United States in this libel.  Martin

-12-

alleged in her pleading that we have federal subject matter jurisdiction by virtue of diversity of citizenship of the parties, 28 U.S.C. § 1332(a)(1), or under our admiralty jurisdiction under 28 U.S.C. § 1333(1). We are satisfied that this case falls within either provision. It is clearly within our admiralty jurisdiction. Moreover, the matter in controversy exceeds $50,000, Martin is a citizen of Mississippi, and Miller is a citizen of Texas. The diversity jurisdiction statute requires no more. § 1332(a)(1). We hold, therefore, that we have subject matter jurisdiction over this libel notwithstanding the fact that Martin did not present her claim to MarAd.

B

(1)

Next, the United States argues that this libel must be dismissed as barred by the Suits in Admiralty Act. As we have earlier noted, the Suits in Admiralty Act is made applicable to the claims of MarAd seamen by the Clarification Act. The Suits in Admiralty Act generally immunizes the master of a government vessel, such as Miller, in his individual capacity: a proviso states that

> where a remedy is provided by [the Suits in Admiralty Act] it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim.

46 U.S.C. § 745.  The United States argues that a "remedy is provided" and that, as a consequence, this proviso requires dismissal of this libel.

In Martin's view, the Clarification Act does not make her claim subject to the Suits in Admiralty Act; this proviso therefore does not apply.  Her position is that the Clarification Act applies only to the claims listed therein and does not apply to other claims that are not specifically listed.  Martin urges that her claim is not within the Clarification Act; as a consequence, she argues, the Suits in Admiralty Act and its exclusivity proviso have no application.

The United States characterizes Martin's claim as a wage claim that, as such, is within the Clarification Act's allowance of claims for "collection of wages, bonuses and making of allotments," to be enforced under the Suits in Admiralty Act.  Martin insists, however, that her claim is not a claim for "collection of wages," arguing that she has already collected her wages.  Instead of seeking wages, Martin argues, she is seeking damages for the unjustified delay in paying her wages.  Because the Clarification Act does not "specifically specify" such an allowable claim, the Suits in Admiralty Act is not the mechanism for the enforcement of her claim, and its exclusivity proviso does not apply and cannot bar her claim; as a consequence, she argues, this particular libel may proceed against the master individually under general maritime law.

We do not agree that Martin's claim is outside the Clarification Act. As an initial matter, we must point out that the statute requires the master or owner to pay "2 days' wages" for each day payment is delayed. 46 U.S.C. §§ 10313(g), 10504(c). Even if Martin's claim bears other characteristics, it is statutorily described as a claim for wages, and thus easily falls within the Clarification Act. To be sure, when the Clarification Act was enacted, the double wage provision (codified at 46 U.S.C. § 596) declared in relevant part that "Every master or owner who refuses or neglects to make payment . . . without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed . . ., which sum shall be recoverable as wages in any claim made before the court." (Emphasis supplied). Thus, the 1983 partial revision of Title 46 merely shortened the statute without changing the character of the remedy Martin seeks: it is now "2 days' wages," instead of the prior "sum equal to two days' pay . . . which sum shall be recoverable as wages." See note 2.

In any event, however, we simply cannot accept Martin's view that the Clarification Act is something less than a comprehensive definition of her rights and remedies as a seaman. The language and legislative history of the Clarification Act, as explained above, make clear that the import of the Clarification Act was to ensure that seamen such as Martin would enjoy the same rights as other seamen. Indeed, the very purpose of the Clarification Act

was to define the rights that had been called into question. The Clarification Act comprehensively defines Martin's rights as a MarAd seaman, and those rights are coextensive with the rights of seamen aboard private vessels. By the terms of the Clarification Act, she has "all of the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated vessels." 50 U.S.C. App. §1291(a). Seen in this light, it is clear that the Clarification Act grants Martin and other MarAd seamen the right to pursue this claim. We hold, therefore, that Martin's claim for double wages is within the Clarification Act.

In the light of this conclusion, it is clear from the terms of the Clarification Act that Martin's claim must "be enforced pursuant to the provisions of the Suits in Admiralty Act [46 U.S.C. § 741 et seq]." §1291(a). To determine whether this libel must be dismissed, we turn to the Suits in Admiralty Act.

(2)

Under our cases, a "remedy is provided" within the meaning of § 745, and this libel must be dismissed if, one, the underlying maritime law would permit the seaman to state the same claim against a private party, and two, the United States has waived its sovereign immunity with respect to that claim. Williams v. Central Gulf Lines, 874 F.2d 1058, 1061 (5th Cir. 1989), cert. denied, 493 U.S. 1045 (1990).

-16-

Thus, the initial question is whether Martin has a claim under applicable maritime law against a private person in the position of the United States. Martin's libel is, we have explained, a claim by a seaman arising from the failure timely to pay her wages. Under 46 U.S.C. §§ 10313(g) and 10504(c), when payment is delayed without justification, "the master or owner shall pay to the seaman 2 days wages for each day payment is delayed." The United States is the owner. The applicable maritime law thus would permit Martin to state a claim for relief against a private person in the position of the United States.

Second, we must consider whether the United States has waived its sovereign immunity with respect to a double wage claim. Reference to 46 U.S.C. § 742, the Act's waiver of sovereign immunity, supplies the answer. It provides, as explained earlier, that "if such vessel were privately owned or operated . . . or if a private person or property were involved . . . a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States." Clearly, Martin's double wage claim is within this broad waiver of sovereign immunity. We find, therefore, that Martin has a traditional claim under admiralty law, and the United States has waived its sovereign immunity with respect to a suit on her claim. Accordingly, we conclude that the exclusivity proviso of the Suits in Admiralty Act excludes this libel against Miller. Instead, Martin's remedy lies in a libel in personam brought against the United States, in

accordance with the Clarification Act and the Suits in Admiralty Act.[4]

---

[4]Of course, to say that Martin's remedy lies in a libel in personam against the United States is not to say that the remedy is to be the same, or that the damages are to be the same, as in a comparable suit against a private party.  It is well understood that sovereign immunity protects the United States from suit.  E.g., F.D.I.C. v. Meyer, 114 S.Ct. 996 (1994).  The question whether the United States has consented to suit is distinct from the question whether the United States has rendered itself amenable to a particular remedy.  Compare, in the context of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (waiving sovereign immunity) with 28 U.S.C. § 2674 (declaring that the liability of the United States is to be the same as the liability of an individual in like circumstances, but that it "shall not be liable for interest prior to judgment or punitive damages").  This case does not require us to consider the question of remedy; we therefore leave it for another day.

Acknowledging that the question is not before us, we should observe that we have been unable to locate controlling authority for the proposition that the United States cannot be held liable for double wages.  The Supreme Court once issued a writ of certiorari in a pre-Clarification Act case to take up the questions whether "(a) the provision for the recovery of double wages is compensatory and not for the imposition of a penalty; and (b) even though a penalty, it is one for which the government is liable by virtue of the provisions of the Suits in Admiralty Act," but then declined to decide these questions.  McCrea v. United States, 294 U.S. 23, 25 (1935).  The Court's characterization of the double wage provision in subsequent cases does not resolve the issue. Compare Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 572 (1982) (explaining that the provision "is not exclusively compensatory" and that "although the sure purpose of the statute is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment" (emphasis added)) with Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 707 n.20 (1945) (pointing to the double wage provision as an example of a statutory remedy that is "not penal in nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages.")  Nor does the evolution of this double wage provision set forth in footnote 2 provide a clear answer.

Finally, we might further observe that whereas the Federal Tort Claims Act, specifically declared that the United States will not be liable for punitive damages, see 28 U.S.C. § 2674, the Suits

III

   To sum up:  we hold that the Clarification Act specifies that
Martin's claim must be enforced pursuant to the Suits in Admiralty
Act.  Applying the two-part <u>Williams</u> test, we conclude that the
Suits in Admiralty Act provides a remedy for Martin's double wage
claim.  Consequently, § 745 bars this libel against Miller.  The
judgment of the district court dismissing this libel is

A F F I R M E D.

---

in Admiralty Act does not contain any similar reference to punitive
damages.  Instead, it declares only that "[a]ny final judgment
rendered in an suit herein authorized . . . shall, upon the
presentation of a duly authenticated copy thereof, be paid."  46
U.S.C. § 748.  On the other hand, we have previously construed the
waiver of sovereign immunity contained in the Suits in Admiralty
Act as a maritime analog of the waiver contained in the Federal
Tort Claims Act.  <u>E.g.</u>, <u>Wiggins v. United States through Dep't of
the Army</u>, 799 F.2d 962, 964-966 (implying the discretionary
function exception of the Federal Tort Claims Act into the Suits in
Admiralty Act).
   It bears emphasis that we do not decide whether the Suits in
Admiralty Act and the Clarification Act make the United States
amenable to double wages.  Instead, we merely observe that we are
not certain that Martin could not recover double wage damages in a
libel <u>in</u> <u>personam</u> brought against the United States pursuant to the
Clarification Act and the Suits in Admiralty Act.